[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 STATEMENT OF THE CASE
The plaintiff, Hershman Recycling, Inc. (HRI), a Connecticut corporation, is a buyer, seller and broker of waste paper. The defendant Allied Waste Industries, Inc. (AWL) is a foreign corporation located in Scottsdale, Arizona. It owns and operates trash recycling businesses in several states.
Its presence in Connecticut is via American Disposal Services of Missouri, Inc. (ADM), operating several "dba's" out of 123 Murphy Street, Hartford. One such "dba" is alleged to be "Capitol Recycling of Connecticut" aka "Capitol Recycling of Connecticut, Inc." aka "Capitol Recycling." The defendants admit to doing business in Connecticut as "Capitol Recycling of Connecticut."
In a three-count complaint, HRI seeks to recover damages for alleged breaches of two contracts dated September 24, 1999 and January 14, 2000. Under those contracts, the plaintiff claims, Capitol Recycling of Connecticut, Inc. became obligated to sell HRI quantities of waste paper.
The defendant AWL is alleged to be the guarantor for any judgment obtained against ADM on the first two counts.
The defendant has denied the allegations of the complaint and raised a "first special defense" containing three claims. These include laches, unclean hands, and a "force majeure" clause in the disputed contracts under which the defendant claims it was excused from performing the contracts because it was unable to obtain paper to sell to HRI as a result of actions of the Connecticut Resource Recovery Authority in reducing the quantity of paper available to it. It has also interposed a counterclaim and setoff. CT Page 1616
A major detriment to unraveling this legal morass existing around all these defendants is the indiscriminate use of the three "Capitol" titles, with apparently little thought being given to the likelihood that they were not one and the same.
The two contracts referred to above were prepared by Ethan Hershman, president of HRI. They recite the parties to be "Hershman Recycling, Inc." and "Capitol Recycling of Connecticut, Inc. a Connecticut Corporation and division of Allied Waste Industries Inc. with a place of business in Hartford, Connecticut." Mr. Hershman signed the contracts for HRI and one David Santos signed as the operations manager for "Capitol Recycling of Connecticut, Inc." This latter entity is not named as a party defendant. It is the title of a company, organized in 1990 and once operating in Connecticut, the assets of which were acquired in November of 1998 by ADM.
The defendants produced evidence that Mr. Santos was never employed by them and actually worked for another recycling company located on the same street in Hartford as the defendants' operation. This company, McCauley Enterprises, was a hauler of waste material and was acquired by AWI in 1998. They also offered testimony that Mr. Santos had no authority to enter into these or any other contracts.
Other disputed facts and contradictory evidence will be discussed in addressing the legal issues.
 DISCUSSION I
Absent a valid, binding contract with a defendant, the plaintiff can recover nothing. As noted above, "Capitol Recycling of Connecticut, Inc.," the party named in the two contracts in question, is not a party to this action.
Liability can attach to ADM only if it contracted with HRI via one of its Connecticut "dba" entities. The plaintiff urges the court to conclude that the above named is one of those entities.
From the evidence presented at trial, the court concludes that that is the case and that ADM used the similar "Capitol" titles interchangeably. Also, the court concludes that by its actions and inactions it held out "Capitol Recycling of Connecticut, Inc." as one of its operating units. CT Page 1617
Support for this view is found in the acceptance by David Santos of the contracts (Exhibits A B) tendered by HRI naming this entity, his signing them on behalf of that entity, the acceptance and depositing of HRI's checks by ADM made out to that name, and the use of that name on at least one truck.
While the defendants argue that David Santos was never employed by them, his sightings at the Capitol facility as reported by numerous witnesses suggests that he was as interchangeable as the "Capitol" designations. The court does not believe that Mr. Santos was an "outsider" who just happened to receive and sign the contracts.
However, regardless of Mr. Santos' employment and alleged lack of authority, the court finds that the defendants, ADM in particular, responded to this situation so as to ratify the action of Mr. Santos and affirm the validity of the contracts.
At no time did they issue a disclaimer and deny the authority of Mr. Santos and, in fact, they proceeded to work with HRI and purported to be performing the contract terms. In Exhibits 3, 4, F, and J in which the contracts are discussed, there is no mention by the authors of any lack of authority as the basis for termination.
As early as August 16, 2000, Mr. Frank DeLoma, acting as "General Manager, Capitol Recycling, and Allied Waste Company" wrote to HRI and stated that letter was to serve "as a notice of default" of the January 14, 2000 agreement. (Exhibit F.)
In Exhibit J, dated January 5, 2001, defendants' counsel advised HRI the contracts were null and void because they had not been approved by the Connecticut Resources Recovery Authority (CRRA).
Another notice of default was sent to HRI on February 19, 2001 by Mr. DeLoma (Exhibit 3), and on March 26, 2001 in Exhibit 4, counsel for the defendants indicated the contracts would be honored despite the designation as "Capitol Recycling of Connecticut, Inc."
In none of these letters is there a suggestion that Mr. Santos' authority to sign the contracts was in question, and the defendants continue to assert their claim to the benefit of the contracts by virtue of default.
The defendants' explanation for their continued dealing with HRI is that HRI was a good customer and Mr. Hershman was a pleasant person to deal with. That course of action could have been pursued while still CT Page 1618 asserting the alleged defect for possible future use.
The court finds the parties entered into valid contracts.
 II
The court next turns to the special defenses contained in the defendants' "first special defense."
 A.
The defendants claims the plaintiff comes to the court with unclean hands in that the plaintiff obtained the contracts by fraud. They refer to a relationship between the plaintiff and an entity called Wellesley Services to which the plaintiff loaned some $600,000. Apparently Wellesley was to work on behalf of the plaintiff to get more material sold to the plaintiff by Capitol. It was also to protect the plaintiff for any shortages in the flow of material from Capitol to HRI. In fact, a payment of $28,257.36 was made to HRI by this company.
However, this is as far as the defendants went in portraying this arrangement as "fraud." They hint that Mrs. Santos was a party to a fraud in executing the contracts favorable to the plaintiff. But the court cannot speculate and act on suspicion only. The defendants had the burden to prove this defense. They reported where Mr. Santos worked. They did not call him or anyone from Wellesley to describe the process that they labeled as fraudulent.
 B.
The defendants' claim of laches is suspect at best. They claim the plaintiff "delayed in asserting its rights as against the defendants under the alleged Agreements because at the time, it was financially prudent to do so." (Post-trial Memorandum of November 8, 2002, page 28-29.)
They proceed to set forth a scenario which is contrary to the facts they presented themselves. The plaintiffs' suit was commenced via a prejudgment remedy application dated April 17, 2001. As recent as February 19, 2001, the defendants advised the plaintiff it was in default of the agreement. (Exhibit 3.) On March 26, 2001, less than a month before the prejudgment remedy application was signed, the defendants wrote to the plaintiff about the agreements. (Exhibit 4.)
The court has read and re-read this claim of the defendants and is at a loss to comprehend its meaning. They seem to be suggesting that the CT Page 1619 plaintiff should have brought suit sooner, during the time they claim to have been doing business with the plaintiff, while endorsing the agreements, and finding HRI to be a good customer!
This defense is rejected.
 C.
The third defense advanced by the defendants is that of "force majeure," based on this language of the contracts:
 5. FORCE MAJEURE The obligations of the Seller and Hershman hereunder with respect to the sale and purchase, shipment and receipt of Product shall be suspended if the Seller is unable to sell or ship or Hershman is unable to purchase, receive or use such Product by reason of strike, machine breakdown, lockouts, close-downs, boycotts, picketing, riots, civil commotion, sabotage, acts of war, embargoes, carrier shortages, raw material shortages, prohibition imposed by any Federal, State or Municipal authority, fires, accidents, floods, market related shutdowns and acts of God; provided that upon the elimination of such cause of suspension the respective obligations of the Seller and Buyer shall thereupon be reinstated from the date of such elimination.
The defendants rely on the action by CRRA which allegedly reduced the amount of material available to them to sell to HRI. However, shortages in the quantities available to HRI had been occurring for several months before the action by CRRA in December of 2000.
ADM had also created or aggravated the shortage problems by contracting with the American Recycling Company in 2000 to provide 2500 tons of material a month. This was done after it was learned that HRI was asserting the existence of the contracts ADM claims were invalid. In effect, the defendants created their own inability to perform. They cannot expect to be excused from legal responsibility when they created the cause of the failure to perform. Dills v. Enfield, 210 Conn. 705,717-18.
The evidence from Anthony Giordano, former employee of ADM, indicates he was prepared to make up the shortage in March of 2002.
The evidence elicited from ADM's site manage portrays the ADM system as "free wheeling, sell at the best price." CT Page 1620
Finally, it is noted that the clause relied upon does not call for termination but only suspension and then reinstatement when the activating cause has been eliminated or remedied.
The defendants' reliance on this clause is misplaced and must be rejected.
 CONCLUSION AS TO LIABILITY
It is the conclusion of the court that the parties were bound by the contracts, Exhibits A B, and that the defendant ADM breached the same. The breaches occurred because the defendant chose to enter into other contracts and transactions to achieve a maximum return without regard to its obligation to the plaintiff.
The court will next address the issue of damages, the defendants' counterclaim and setoff, and the third count against AWL.
 DAMAGES
The plaintiff called Paul Greenberg, a CPA with 27 years of practice to support its claim for damages for the term of the contracts remaining after the termination.
The defendants objected to his testifying, arguing that a Daubert
hearing should have been granted them. It is their position that Greenberg's testimony was not consistent with "generally accepted methodology standards . . ." or to "generally accepted treatises on that issue . . ." (Defendants' Post-Trial Memorandum, page 39.)
The plaintiff has cited several cases in opposition to this view and the court agrees with the plaintiff, and in particular its reference toBeverly Hills Concepts v. Schatz and Schatz, 247 Conn. 48 (1998).
 We have permitted lost profits to be calculated by extrapolating from past profits. See, e.g., Westport Taxi Services, Inc. v. Westport Transit District, 235 Conn. 1, at 32-33 (1995) (proper to base lost profits award on profits from preceding year); Humphrys v. Bead, 149 Conn. 14, 21 (1961) ("[i]n the absence of evidence to the contrary, the court was entitled to draw the inference that the plaintiff's business would continue to be profitable as it had been in the year and a half before the fire").
Beverly Hills Concepts, supra at 69-70. CT Page 1621
To quote Judge Sheldon in Pepe and Hazard v. Jones,33 Conn.L.Rptr. 77, 84, 2002 WL 31255542 (Conn.Super. 2002), at page 9:
 There is nothing obscure or difficult to grasp about testimony that simply solves a straightforward arithmetic problem.
This was stated in the course of rejecting a claim that a lost profits estimate must be excluded under State v. Porter, 241 Conn. 57 (1997).
Mr. Greenberg testified at length about the steps he followed and the data he applied. He utilized two methods for his computations and then averaged the results obtained from each. These averages were then advanced as a reasonable determination of the damages sustained by the plaintiff.
After a thorough examination of Mr. Greenberg's methodology and the date he relied on, the court finds only one computation with which it disagrees. This involves his use of the figure of 17,314 tons to compute the per ton profit for the 17 months period between October 1, 1999 and March 1, 2001. As the defendants were only obligated to provide 1,000 tons a month, the inclusion of the additional 314 tons (at 4.56 per ton) for that period results in a loss of profit by this method of $212,902.00, rather than $188,560.
This figure, when averaged with the $187,443 resulting from his alternative computation results in a reduction to $188,000 from $199,800 (figures rounded).
The court therefore finds the plaintiff's total lost profits to be the above $188,000 and $1,317,300 for a total of $1,505,300.
 SETOFF AND COUNTERCLAIM
The defendants' counterclaim repeats the allegations of fraud in the execution of the contracts in question. However, no evidence was offered to support his serious charge. And, it was counsel for the defendants who elicited testimony as to where David Santos could be located. Yet, though he purportedly acted in some dishonest way to give HRI the benefit of the contracts, he was not called to testify as to his role in that process. This unsupported allegation is therefore, rejected.
The plaintiff has acknowledged it is indebted to ADM, via its "dba's," in the amount of $369,641.45. It protests the addition and compounding of interest, citing cases to the effect that interest cannot be charged unless it has been agreed to by the party to be charged. In this case, CT Page 1622 the billings, in question date from September 2000, by which time ADM had breached the contracts with HRI. HRI had been complaining of shortages since May 2000. Significantly, the first written notice to HRI claiming a default is dated August 16, 2000. (Exhibit F.) After Mr. Hershamn responded and denied HRI was in default, the parties resumed continuing to do business. The court rejects the claim of interest on this setoff.
The defendants are awarded an additional set off in the amount of $28,257.36, the sum paid to HRI by Wellesley Services under their agreement to protect HRI from losses sustained because of ADM's failure to provide the tonnage called for in the contracts.
Interest is not awarded on the plaintiff's recovery in view of the fact that there were these setoffs, the plaintiff's claim was disputed and unliquidated, and a substantial portion of it is for future damages.
 SUMMARY AND JUDGMENT OF THE COURT
Judgment may enter for the plaintiff to recover of the defendant ADM the sum of $1,505.300, less the amount of the setoffs awarded in the amount of $397,989.81, for a net judgment of $1,107,401.19.
The plaintiff is entitled to its taxable costs.
As to the third count, the court finds that by virtue of the language of Exhibit R, the defendant Allied Waste Industries, Inc. is "responsible for paying, satisfying and discharging the above judgment." This is not
merely a guarantee and therefore judgment may also enter against AWI in the amount of $1,107,401.19, plus costs.
Finally, the defendants are ordered to withdraw the case of AlliedWaste Industries, Inc. v. Hershman Recycling, Inc., #CV 01-0809325 S, pending in the Hartford Superior Court, it appearing this is the same cause of action presented in this case via their "setoff" on which they were successful.
Anthony V. DeMayo Judge Trial Referee CT Page 1623